UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

INTERNATIONAL UNION OF PAINTERS
AND ALLIED TRADES DISTRICT COUNCIL
NO. 78 HEALTH & WELFARE FUND, ET AL.,

      Plaintiffs,

vs.                                                        Case No.8:05-cv-1661-T-24TGW

HARRY ARGYROS, JR., ET AL.,

      Defendants.
_____/

**ORDER**

This cause comes before the Court on three motions for summary judgment: (1) Defendant Harry Argyros' Motion for Summary Judgment (Doc. No. 42), which Plaintiffs oppose (Doc. No. 65); (2) Defendant Mid South Glass Company of Tampa Bay, Inc.'s ("Mid South") Motion for Summary Judgment (Doc. No. 43), which Plaintiffs oppose (Doc. No. 65); and (3) Plaintiffs' Motion for Partial Summary Judgment as to Liability (Doc. No. 64), which Defendants oppose (Doc. No. 66). The Court held a hearing on these motions on April 27, 2007.

**I. Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). A moving party discharges its burden on a motion for summary judgment by

"showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. Id. at 325. Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim. See id. When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial. Id. at 324.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Samples on behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. See Augusta Iron & Steel Works v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

**II. Allegations in the Pleadings**

Plaintiffs Union[1], Trust Funds[2], and Trustees of the Trust Funds[3] have sued Defendant

---

[1]International Union of Painters and Allied Trades District Council No. 78 is referred to herein as the "Union."

[2]International Union of Painters and Allied Trades District Council No. 78 Health and Welfare Fund ("Welfare Fund") and International Union of Painters and Allied Trades District

Mid South for delinquent contributions allegedly owed, pursuant to ERISA[4] and the Labor Management Relations Act[5] ("LMRA").  Plaintiffs have sued Defendant Harry Argyros (Mid South's owner and president) for breach of ERISA fiduciary duties in connection with the non-payment of the contributions allegedly owed.

In response, Mid South has asserted a counterclaim against the Union and Trust Funds, and Mid South has asserted a third-party claim against William Gallagher.  Mid South alleges that no contributions are owed, because there was fraud in the execution of the documents that create the obligation to pay the contributions allegedly owed.  As such, Mid South asserts claims of fraudulent misrepresentation and unjust enrichment against the Union and a claim of restitution against the Trust Funds.  Additionally, Mid South asserts a claim against Gallagher for fraudulent misrepresentation.

## III.  Background

Mid South is a commercial glazing subcontractor that is owned by Argyros, who serves as Mid South's president.  Gallagher started working with Mid South, and he obtained the labor necessary for Mid South to do field work.

In connection with two of Mid South's projects, Gallagher had Mid South sign two Memorandums of Understanding ("MOU") with the Union.  The MOUs were not collective

---

Council No. 78 Pension Fund ("Pension Fund") are collectively referred to herein as "Trust Funds."

[3]Tim Maitland, as Trustee of the Welfare Fund, and Gary Meyers, as Trustee of the Pension Fund, are collectively referred to herein as "Trustees."

[4]Plaintiffs bring their ERISA claims pursuant to 29 U.S.C. § 1132 and § 1145.

[5]Plaintiffs bring their LMRA claims pursuant to 29 U.S.C. § 185.

bargaining agreements ("CBA").

The Union would only allow companies to enter into three MOUs, and thereafter, the company would have to sign a CBA in order to get union labor. In 2003, Argyros signed a signature page to a three-year CBA. There is a dispute as to whether Argyros knew that he was signing a three-year CBA when he signed the document.

Mid South made contribution payments to the Trust Funds after signing the signature page to the CBA in 2003. In the summer of 2004, Mid South received an envelope containing three copies of a revised CBA covering the second two years of the original three-year CBA. Mid South did not sign the 2004 revised CBA at that time.

Thereafter, on July 29, 2004, Argyros signed one or more documents. There is a dispute as to what Argyros signed and whether he knowingly signed the 2004 revised CBA on July 29, 2004.

In October or November of 2004, Gallagher ended his relationship with Mid South. Also in October or November of 2004, Mid South stopped making benefit contribution payments to the Trust Funds, because Mid South had money problems and because Mid South learned disturbing things about Gallagher. However, Mid South continued to employ union workers until late 2005. In response to Mid South's failure to continue making contribution payments, on September 6, 2005, Plaintiffs filed suit. Mid South ceased operations in April of 2006.

**IV. Motions for Summary Judgment**

Currently before the Court are three motions for summary judgment. Accordingly, the Court will address each motion.

### A. Defendant Mid South's Motion for Summary Judgment

Mid South makes various arguments in support of its contention that it is entitled to summary judgment on Plaintiffs' claims.[6] Upon consideration of the record and argument made by counsel at the hearing, the Court finds that there are genuine issues of material fact that preclude summary judgment on Plaintiffs' claims.

### B. Defendant Argyros' Motion for Summary Judgment

Argyros moves for summary judgment on Plaintiffs' claim for breach of fiduciary duty asserted against him individually. ERISA defines a "fiduciary" as a person who "exercises any discretionary authority or discretionary control respecting management of [an ERISA] plan or exercises any authority or control respecting management or disposition of its assets," or who "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Furthermore, pursuant to 29 U.S.C. § 1109(a), "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."

Plaintiffs claim that Argyros was a fiduciary and that his failure to cause Mid South to make contribution payments after October of 2004 breached his fiduciary duty that arose due to the amendments to the language in the Welfare and Pension Trust Funds' trust documents that make contributions owed by an employer property of the Welfare and Pension Trust Funds. Specifically, in March of 2004, the agreement and declaration of trust governing the Welfare

---

[6]The Court notes that one of the arguments made by Mid South is that the Union lacks standing to assert an ERISA claim against Mid South. However, Plaintiffs stated at the hearing that the Union was not asserting any ERISA claims.

Fund allegedly[7] was amended to replace the definitions of "Trust Fund" and "Contributions" with the following language:

> "Trust," "Trust Fund" and "Fund" as used herein shall mean the entire trust estate of the I.U.P.A.T. District Council No.78 Health and Welfare Trust Fund as it may, from time to time be constituted, including but not limited to all funds and other monies accrued and due, owing and payable as, and received in the form of, contributions . . .. This definition shall be construed liberally in the broadest terms to effectuate its intent that the entire trust estate of the Trust Fund includes, but is not limited to, all funds, monies, sums and other property owed pursuant to a Collective Bargaining Agreement or other written agreement from the date(s) due regardless of whether paid or remitted.
>
> \*       \*       \*
>
> The term "contributions" shall mean the payments made, or required to be made, by an Employer as defined in Section 1.1 above to or for this Fund, including all funds and other monies accrued, due, owing and payable, or paid, to the Trustees by an Employer as, or in the form of, contributions . . . and all such payments or other monies made, or required to be made, by or on behalf of participants or their beneficiaries.

(Maitland depo[8], Ex. 16: Amendment No. Three). In October of 2003, a similar amendment was made to the Pension Fund. (H. Argyros decl.[9], Ex. A).

Plaintiffs, however, have not pointed to any evidence in the record that shows that Argyros ever saw the Trust Funds' trust and plan documents, or these amendments, prior to this litigation. (Maitland depo, p. 12-13, 41-42, 68; H. Argyros depo[10], p. 206; H. Argyros decl., ¶ 2; Dewyer depo[11], p. 111-12). At the hearing, Plaintiffs conceded that Argyros never saw the Trust

---

[7]The signature page that is before the Court for this alleged amendment is unsigned.

[8]Timothy Maitland's deposition and exhibits thereto can be found at Doc. No. 61, 56.

[9]Harry Argyros' declaration can be found at Doc. No. 62.

[10]Harry Argyros' deposition and the exhibits thereto can be found at Doc. No. 47, 49, 44.

[11]Francis Dewyer's deposition and exhibits thereto can be found at Doc. No. 55, 68.

Funds' trust and plan documents, or these amendments, prior to this litigation.

Argyros moves for summary judgment on Plaintiffs' breach of fiduciary duty claim, arguing, among other things, that he lacked notice of his alleged fiduciary status under the plans governing the Trust Funds or the potential for individual liability due to his alleged fiduciary status. As explained below, the Court finds that summary judgment should be granted in favor of Argyros on the breach of fiduciary duty claim.

To establish ERISA fiduciary status within the meaning of § 1002(21)(A) of ERISA, Plaintiffs must "show (1) that the unpaid contributions were plan assets, and (2) that [Argyros] exercised authority and control over the management or disposition of these assets." In re Luna, 406 F.3d 1192, 1198 (10th Cir. 2005). For the purposes of his motion for summary judgment, Argyros assumes that the alleged amendments to the Trust documents make unpaid, owed employer contributions assets of the Trust Funds.

The Eleventh Circuit has stated that ERISA "imposes strict fiduciary duties on certain persons with control over assets of covered employee benefit plans. Under these provisions, when unpaid contributions to a plan are identified as immediate assets of a plan, officers of the nonpaying corporation with control and authority over the unpaid contributions may be held liable for the amount of nonpayment." ITPE Pension Fund v. Hall, 334 F.3d 1011, 1012 (11th Cir. 2003). Argyros, however, argues that summary judgment should be granted on the breach of fiduciary duty claim because he lacked notice of his alleged fiduciary status under the documents governing the Trust Funds or the potential for individual liability due to his alleged fiduciary status. The following case law supports Argyros' argument that he cannot be held liable in his individual capacity because he lacked notice of his alleged fiduciary status or that

the unpaid, owed contributions were assets of the Trust Funds.

In <u>ITPE Pension Fund v. Hall</u>, the issue before the appellate court was whether corporate officers could be imputed fiduciary duties and held personally liable for unpaid contributions when the governing agreement between the corporation and the plan did not clearly state that contributions were plan assets. 334 F.3d at 1012. In finding that either clear contractual language or clear, shared intent of the parties is necessary in order to impose fiduciary responsibility on officers who would otherwise be unsure of their increased responsibilities under ERISA, the court stated:

> A person should not be attributed fiduciary status under ERISA and held accountable for performance of the strict responsibilities required of him in that role, if he is not clearly aware of his status as a fiduciary: "If ERISA did not limit the definition of fiduciaries to those with knowledge of their authority and discretion, then persons or entities could become subject to fiduciary liability without notice. Such a result would not only be unfair, but it would also disserve a core purpose of ERISA, which is to create a system whereby accountable fiduciaries are motivated by their accountability to protect the interests of participants in ERISA plans."

<u>Id.</u> at 1012, 1015 (quoting <u>Herman v. NationsBank Trust Co.</u>, 126 F.3d 1354, 1366 (11th Cir. 1997)).

In <u>Herman v. NationsBank Trust Co.</u>, the Secretary of the Department of Labor ("the Secretary") filed suit against the trustee of an employee stock ownership plan ("ESOP"), claiming that the trustee violated ERISA by failing to exercise independent judgment in responding to competing tender offers for the ESOP's shares. 126 F.3d at 1357. The ESOP shares were divided into two categories, allocated shares and unallocated shares. <u>See id.</u> The ESOP provided that participants voted their allocated shares like ordinary shareholders and that the trustee would vote the unallocated shares in the same proportion as allocated shares. <u>See id.</u>

8

The trustee argued that it was not liable for failing to exercise independent judgment in responding to competing tender offers for the ESOP's shares, because the ESOP participants were fiduciaries with respect to the tendering of the ESOP shares and the trustee was merely a directed trustee with regard to the tendering of the ESOP shares. See id. at 1362. The Secretary responded that the ESOP participants could not be fiduciaries with respect to the tender of the unallocated shares, because the ESOP participants were not informed of their power to control the unallocated shares. See id. at 1365.

The appellate court agreed with the Secretary,stating:

> [A] fiduciary must have discretion to decide the disposition of plan assets or must exercise authority or control over plan assets. The term "discretion" means the "power of free decision or choice" or "individual judgment." *Webster's Third New International Dictionary* 647 (1986). In order to have the power of decision or choice, a person must know that he can decide an issue and be aware of the choices he has. A person cannot exercise the power of choice or individual judgment unless he is aware of his ability to do so. To "exercise" is to "make effective in action," *id.* at 795, and a person must have knowledge of his authority or power to control in order to exercise control. In order for a fiduciary to exercise discretion, the fiduciary must engage in conscious decisionmaking or knowledgeable control over assets. Based on the plain language of ERISA, ESOP participants are not fiduciaries when they do not knowingly decide how assets will be managed. Or, restated in the terms of this case, ESOP participants are not fiduciaries with regard to unallocated shares when they are not given notice that their action or inaction with regard to their allocated shares will control the disposition of the unallocated shares.

Id. at 1365-66.

The appellate court concluded that the ESOP participants could not be fiduciaries with respect to the tendering of unallocated shares if they were "not adequately informed of the responsibilities they possess[ed] and the liability that could go hand in hand with those responsibilities." Id. at 1367. In denying the trustee's petition for rehearing, the appellate court again stated that "[t]he participants could not be fiduciaries with regard to the unallocated shares

9

in the absence of explicit notice that they could be held liable for their actions with regard to the unallocated shares." Herman v. NationsBank of Georgia, N.A., 135 F.3d 1409, 1410 (11th Cir. 1998).

Likewise, in Iron Workers' Local No. 25 Pension Fund v. Future Fence Co., 2006 WL 2077639 (E.D. Mich. July 24, 2006), the court considered a person's lack of notice of his alleged fiduciary status to be fatal to the plaintiffs' claim that the person was an ERISA fiduciary. In Future Fence, the plaintiff trust funds tried to hold the president of a corporation that signed a CBA personally liable for unpaid contribution payments that were owed pursuant to the CBA. See id. at *1. In rejecting the plaintiffs' argument that the president, Kenneth Hollowell, was personally liable for the unpaid contributions as an ERISA fiduciary, the court stated:

> In this case, while Mr. Hollowell signed the 1987-1989 CBA on behalf of [the company], he never agreed to be personally liable for the company's fringe benefit contributions. More importantly, Mr. Hollowell attests that he neither received nor had any knowledge of the Funds' trust agreements prior to this litigation. . . . Thus the evidence indicates that Mr. Hollowell never was made aware of his personal duties as a fiduciary.

Id. at *9.

Similarly, in Hotel Employees & Restaurant Employees International Union Welfare Fund v. Billy's 1870, 2004 WL 1879986 (N.D. Ill. Aug. 12, 2004), the issue before the court was whether it should enter default judgment against the sole shareholder and officer of a company that signed a CBA but did not make the required contribution payments. See id. at *1. The court found that the unpaid contributions were plan assets under the terms of the CBA, but the court cited Hall's statement that a person should not be attributed fiduciary status under ERISA without being clearly aware of his status as a fiduciary. See id. (citing Hall, 334 F.3d at 1015). The court found that since the plaintiffs failed to allege that the officer was a party to the CBA or

that he signed it as anything but an agent of the corporation, the court declined to hold the officer to be an ERISA fiduciary. See id. at *2

Likewise, in National Roofing Industry Pension Fund v. W.R. Kelso, Inc., 2005 WL 2708345 (N.D. Ind. June 6, 2005), the issue before the court was whether the president of the company was liable for delinquent contributions owed under the CBA. See id. at 4. The court stated that even if the delinquent contributions were plan assets and the president had authority over those assets and directed that they be used to pay the company's creditors rather than the trust fund, that was not enough to confer fiduciary status on the president. See id. at *5. Instead, the court stated that in order for the president to be deemed an ERISA fiduciary, the president would have to have knowingly undertaken a fiduciary duty to the trust fund. See id.

Based on the above case law, Argyros argues that since he did not have notice of his alleged fiduciary status or that the unpaid, owed contributions were assets of the Trust Funds, he cannot be found to be an ERISA fiduciary and cannot be held personally responsible for the unpaid contributions. Plaintiffs respond that by signing the CBA, Argyros agreed to be bound to the trust agreements as amended from time-to-time, and as such, he was bound by the trust documents and deemed to know that the unpaid, owed contributions were plan assets. The Court rejects this argument, because Argyros signed the CBA on behalf of Mid South, and as such, Mid South is the entity that agreed to be bound by the trust agreements, not Argyros. Argyros never saw the trust documents, and the Court will not impute knowledge of the terms of the trust agreements to Argyros, since he did not sign the CBAs in his individual capacity. Therefore, the Court will not hold Argyros personally liable for unpaid, owed contributions, since he did not learn that unpaid, owed contributions were assets of the Trust Funds prior to this lawsuit.

Accordingly, the Court finds that since Argyros did not have notice of his alleged fiduciary status or that the unpaid, owed contributions were assets of the Trust Funds, he cannot be found to be an ERISA fiduciary and cannot be held personally responsible for the unpaid contributions. As such, the Court grants Argyros' motion for summary judgment on the breach of fiduciary duty claim.

### C. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for partial summary judgment in this case. Specifically, they move for summary judgment on Mid South's counterclaims of fraudulent misrepresentation, unjust enrichment, and restitution, and they move for summary judgment on their claim that Mid South is liable for delinquent contributions (but they do not seek to establish the amount of such contributions through summary judgment). Upon review of the record and based on the arguments made by counsel at the hearing, the Court finds that genuine issues of material fact exist that preclude summary judgment in Plaintiff's favor, except as to Mid South's restitution claim and partially as to Mid South's unjust enrichment claim.

#### 1. Restitution

Mid South asserts a restitution claim against the Trust Funds in in an attempt to get the contributions it paid returned. Plaintiffs argue that there is no basis for Mid South's restitution claim based on Dime Coal Company, Inc. v. Combs, 796 F.2d 394, 399 n.7 (11th Cir. 1986), in which the Eleventh Circuit refused to recognize a federal common law cause of action by an employer for restitution of benefit contributions paid.

In Dime Coal, the Eleventh Circuit was faced with the issue of whether an implied right of action under ERISA existed to recover payments mistakenly made by employers, and the

court held that there was not. In a footnote, the court stated:

> Dime Coal, in its amended complaint, "invoke[d] the equity jurisdiction of [the district court], and aver[red] that it [was] entitled, as a matter of equity, to a refund of the excess contributions or overpayments it made to the [trustees]." The opinion and order of the district court provides no indication whether, in granting summary judgment for Dime Coal, the court intended to rely to any degree on this alternative ground for recovery of the mistaken contributions. Dime Coal has not clearly argued the sufficiency of this basis for sustaining the district court's decision on this appeal, but [Dime Coal] has cited three decisions that appear to suggest that such a theory of recovery might be viable. . . . Although the question is not well presented, since [Dime Coal] has not seriously pursued this alternative basis for affirmance on its appeal, ***we hold that no federal common law right to recovery of the disputed contributions at issue in this case exists.*** As the Supreme Court recently cautioned, "the presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement."

Id. at 399 n.7 (emphasis added).

Mid South acknowledges this authority, but it asserts this claim so that it can ask the Eleventh Circuit to revisit the issue should the case proceed to an appeal. Based on Dime Coal, the Court grants Plaintiffs' motion for summary judgment on Mid South's restitution claim.

### 2. Unjust Enrichment

Mid South asserts an unjust enrichment claim against the Union in an attempt to get the contributions it paid to the Union's various programs (such as the Union's political action fund and the Union's organizing and apprenticeship training funds) returned. (Doc. No. 9, ¶ 9, 19 of counterclaim). This argument is based on the assumption that the CBA is void due to fraud in the execution.

The elements of unjust enrichment "are 'a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the

13

value thereof.'" <u>Florida Power Corp. v. City of Winter Park</u>, 887 So. 2d 1237, 1242 n.4 (Fla. 2004)(quoting <u>Ruck Bros. Brick, Inc. v. Kellogg & Kimsey, Inc.</u>, 668 So. 2d 205, 207 (Fla. 2d DCA 1995)). At the hearing, Plaintiffs argued that the unjust enrichment claim must fail, because there was no benefit conferred on the Union. Specifically, Plaintiffs argue that the payments that Mid South paid to the Union were made for the benefit of the union workers, not for the benefit of the Union. As such, the Union argues that it was not unjustly enriched by the payments.

To the extent that Mid South argues that the payments to Union programs made on behalf of workers supplied by the Union unjustly enriched the Union, the Court rejects this argument. The Court finds that it is not unjust or inequitable to allow the Union to retain payments to Union programs made by Mid South on behalf of workers supplied by the Union, because the Union gave something of value in return for Mid South's payments–the Union supplied Mid South with union workers that performed work for Mid South. As such, the Court finds that it would not be inequitable or unjust to allow the Union to retain those payments because it has given value in return, and as such, the Court grants Plaintiffs summary judgment as to those payments. However, to the extent that Mid South made payments to Union programs on behalf of workers not supplied by the Union (<u>i.e.</u>, payments made on behalf of Mid South's own employees), the Court finds that there is a genuine issue of material fact that precludes summary judgment as to whether the Union was unjustly enriched by these payments.

**V. Conclusion**

Accordingly, it is ORDERED AND ADJUDGED that:

(1)     The Court **STRIKES** Plaintiffs' Notice of Filing Materials in Support of Its

Motion for Partial Summary Judgment (Doc. No. 78) because it is untimely.

(2) Defendant Harry Argyros' Motion for Summary Judgment (Doc. No. 42) is **GRANTED**. The Court grants summary judgment in favor Argyros on Plaintiffs' breach of fiduciary duty claim.

(3) Defendant Mid South Glass Company of Tampa Bay, Inc.'s Motion for Summary Judgment (Doc. No. 43) is **DENIED**.

(4) Plaintiffs' Motion for Partial Summary Judgment as to Liability (Doc. No. 64) is **GRANTED IN PART AND DENIED IN PART**: The motion is **GRANTED** to the extent that the Court grants summary judgment in favor of Plaintiffs on Mid South's restitution claim, and the Court grants summary judgment in favor of Plaintiffs on Mid South's unjust enrichment claim to the extent that it is based on payments Mid South made to Union programs on behalf of workers supplied by the Union; otherwise, the motion is **DENIED**.

**DONE AND ORDERED** at Tampa, Florida, this 2nd day of May, 2007.

*Susan C. Bucklew*
SUSAN C. BUCKLEW
United States District Judge

Copies to:
All Parties and Counsel of Record